## Case No. 14,713.

### UNITED STATES v. CAMBUSTON.

[7 Sawy. 575.] [1]

District Court. D. California.   June. 1859.

MEXICAN LAND GRANTS—CAPACITY OF FOREIGNERS TO RECEIVE—REPEAL OF LAWS—AUTHORITY OF GOVERNORS — PRESUMPTIONS FROM OFFICIAL ACTS.

[1. The law of Mexico of 1824, which permitted and invited foreigners to settle on the vacant lands of the republic, was repealed by the law of December 29, 1836, which provided "that foreigners cannot acquire real estate in the republic, unless they have been naturalized and married to a Mexican woman, and have otherwise complied with the laws relating to such acquisition. The acquisitions of colonists will be subject to special laws of colonization." But if it be assumed that the act of 1836 did not repeal the law of 1824, such repeal was effected by the 12th article of the law of 1842, which provides that "foreigners cannot acquire real or public lands, in all departments of the republic, without contracting for them with the government, which passes this right as representing the domain of the Mexican nation." Therefore, after the latter act, no unnaturalized foreigner had capacity to receive a grant of land without the express license of the supreme government.]

[2. The rule that public acts of public officers shall, in absence of proof to the contrary, be presumed to have been done in the exercise of a legitimate authority, applies with but little force to grants of land made by the Mexican governor of California, within a few weeks before the territory passed from his hands, and during the heat and conflict of the struggle in which his power was overthrown, especially where the evidence that the formalities required by law were observed is imperfect and unsatisfactory, and rests wholly in parol, where it does not appear that any preliminary inquiries were made as to the point on which he is supposed to have exceeded his authority, and where his situation and the mode in which he exercised his authority in other cases about the same time suggests a suspicion of carelessness and recklessness in the exercise of his powers.]

[3. Where a grant was made by the governor of California, just before the territory was wrested from his hands, to one who was commonly supposed to be a French citizen, and in whose behalf the French minister to Mexico had made strong representations to that government a short time before, and it was not stated in the grant either that he had been naturalized or that he had obtained a license from the supreme government to take the lands, held, that the mere fact of the making of the grant did not, under the

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

circumstances, raise any presumption that he had been naturalized or that he had received such license, and the burden was on him to show affirmatively the existence of one of these facts in order to establish his right to receive the grant. U. S. v. Reading, 18 How. (59 U. S.) 9, distinguished.]

[Cited in Bouldin v. Phelps, 30 Fed. 569.]

[4. The Mexican governors of California had no authority to remove the disabilities of foreigners in respect to holding lands under the laws of 1836 and 1842; and an attempt to make a grant to a foreigner by executing the necessary papers could not, therefore, operate as an enfranchisement. which would render the grant effectual.]

[Claim by Henry Cambuston for 11 leagues of land in Butte county, on the Sacramento river.]

HOFFMAN, District Judge.   The claim in this case having been confirmed by this court [Case No. 14,712], the case was appealed to the supreme court, by whom the decree was reversed, and the cause remanded for further proofs. [20 How. (61 U. S.) 59.]

The principal grounds assigned by the supreme court for their decision, are:   The want of all record testimony, or any explanation of its absence.   The unsatisfactory character of the evidence as to the genuineness of the signatures.   The absence of any evidence that the preliminary steps required by the law to a grant of public domain by the governors had been observed, especially those which were matters of record.   That the grant was not recorded in the proper book, or in any book whatever, so far as appeared by the proofs. That it was a pure donation, without pecuniary consideration or meritorious services.   That it was unaccompanied by the forms and usages always observed in making grants. That it was unknown to any one except the grantee and one other interested person, until 1850.   That it was made by a governor who had recently expelled his predecessor, and who was not proved to have been recognized by the supreme government.   That it was made but one month and a half before the conquest of the country by the United States forces, and during the very heat and conflict of the struggle in which the power of the governor was overthrown; and, therefore, that his authority to make it, and the bona fides of its exercise, should be scrutinized with great care.

As these objections had not been urged before the commissioners or this court, the cause was remanded that the claimant might, if in his power, remove them by the introduction of further evidence.   Further evidence has accordingly been taken, and the cause is again submitted for decision.

As to many of the points alluded to by the supreme court, the testimony leaves no room for doubt.   The original grant is produced from the archives where it has remained since 1850, when it was deposited with Major Canby.

The signatures of Pico and Moreno are un-

doubtedly genuine. The grant is also shown to be in the handwriting of Augustin Olvera, who was secretary to the departmental assembly; and Mr. Hopkins, the keeper of the archives, states that, in the water-marks and general appearances of the paper on which it was written, it corresponded with paper used at its date. That officer seems to entertain no doubt of the genuineness of the signatures, and his opinion is of great value.

The real point in the case is not whether Pico and Moreno signed the grant, but when they did do so. It is also shown, and the fact is known to the court as part of the history of the country, that Pio Pico had been recognized by the supreme government as constitutional governor of the department before the date of this grant.

Before proceeding to consider the proofs as to the facts that the preliminary steps requisite to a grant were taken, and which explain the absence of record evidence that it issued, it may be observed that, according to the usage of the Mexican government, the record evidence, as well of the preliminary proceedings as of the issue of the grant, should be found in the espediente, and in the book known as the "Toma de Razon."

The espediente, as is well known, consisted of the petition, with the marginal order of the governor; the informes, when they were furnished; the decree of concession, and. usually, a borrador, or draft, of the title delivered to the party. These papers, stitched together. formed the espediente, which was preserved among the archives and formed the only record of the proceedings, except that contained in the Toma de Razon. This last was a book in which short entries were made of the date of the grant, the name of the grantee, and that of the land granted.

If, therefore, the espediente in any case be lost, and the Toma de Razon, for the year in which the grant was made, be also lost, no record evidence of the grant would exist, unless it should happen to be referred to in other grants or espedientes, a reference not likely to occur with respect to a grant of late date.

It is shown in this case, and the fact is notorious, that the book of Toma de Razon, for the year 1846, is not among the archives. It is also in proof that the archives were, for some months after the seizure of the country by the Americans, left in a condition where spoliations or loss of documents may have taken place. But the extent of such spoliations has been greatly exaggerated, for the archives exist in a degree of completeness and perfection greater, perhaps, than could have reasonably been anticipated, as is proved by the fact that all the espedientes, to the number of four hundred and twenty-two, of which a list was made by Jimeno, are found on the files. Nevertheless, it is possible that some espedientes have been lost. Colonel Fremont appears to have removed several, which were lost in the

mountains; and the testimony of Captain Halleck shows that such. an accident may very possibly have happened.

The absence, therefore, of all record evidence of this grant does not conclusively show that no espediente in the case ever existed. It may possibly have been lost; but. such an accident is extremely improbable.

It has already been stated that all the espedientes mentioned in Jimeno's list, to the number of four hundred and twenty-two, are found in the archives. The latest concession entered in that list is dated December 24, 1844. I am not aware that the espediente for any concession mentioned in the Toma de Razon for the succeeding year, and which contains entries down to December 23, 1845, is lost, though such may be the case.

It was certainly, therefore, by a most unfortunate, and what would, a priori, be thought a most improbable accident, that the espediente in this case was lost, when so large a number of similar documents. subjected to the same chances, were preserved in an unbroken series. To prove the existence of the espediente the claimant has examined Pio Pico and Jose Matias Moreno.

Governor Pico swears that he does not remember the petition, but that it must have been presented, or the grant would not have issued; that he believes the signatures to be those of himself and Moreno, and that he also believes the grant was signed on the day it bears date. He does not pretend, however, to remember the fact of having made the grant, nor that any informes were asked for or obtained, but, with his usual caution and evasiveness, confines himself to the expression of his belief that it bears his signature and was executed at its date.

Moreno's testimony is more positive. He swears that a petition signed by Cambuston was addressed to the governor, praying for certain lands in the North; that the petition was dated previously to the grant; that he saw this petition when he became secretary, May 1, 1846; and that attached to it were the informes of certain authorities (who they were he does not recollect), and an order of the governor directing the grant to issue.

He also testifies that he made a note of the grant in the Toma de Razon, and that the espediente remained among the archives until Governor Pico and himself were driven from the country. No other witness is produced by whom the petition of Cambuston or the espediente was ever seen, or who has any knowledge of their existence.

The officers who gave the informes are not produced, though it would seem not difficult to discover who they were, and to procure from them evidence of the fact that they reported on the application.

As Governor Pico makes no mention of any informe, and merely infers that a petition was presented from the fact that a grant issued, the only evidence tending to show that the espediente was formed, and that the usual

preliminary steps were taken by the governor, is that of Moreno,—a witness not unknown to this court, and whose credibility it has, on several occasions, been called upon to consider.

The existence of a document of this character, unknown to any other person,—which is not found in its proper place of custody, where it would be found unless an extraordinary accident be supposed to have occurred, —a part of which (viz., the petition) would probably have been known to other persons than the applicant, and certainly to the authorities by whom the informe was furnished, can hardly be said to be satisfactorily proved by the uncorroborated testimony of Moreno.

The fact, however, that a grant was asserted to be in existence in 1846 or 1847, is testified to by some witnesses on whom the court can rely with entire confidence.

P. B. Reading testifies that he heard of this claim as early as 1846; that he heard several persons speak of the Cambuston claim as adjoining Sutter's northern line near the "Buttes," on the Sacramento. On his cross-examination he states that, according to his best recollection, he heard this in 1846,—certainly not previously; but that, in looking back for thirteen years, it is not possible to recollect such a fact with certainty unless connected with some event.

Colonel J. D. Stevenson, who arrived in California March 6, 1847, in command of the first regiment, New York volunteers, testifies that he became acquainted with Cambuston in April, 1847, and was intimate with him and his family until he left Monterey, in May of the same year; that he renewed his acquaintance with him in October, 1848, and has been closely intimate with him ever since; that in 1847 he was in the habit of visiting daily the Soberanes family, with whom Cambuston was then residing, and into which Cambuston subsequently married; that Doctor Townsend and his wife were also residing with that family, and that he first heard the grant spoken of by these latter in presence of Cambuston; that it was alluded to as being the Sacramento valley between Sutter's line and that of a man named Flugge; that subsequently, in May, 1847, he became acquainted with Flugge, and continued intimate with him until he (witness) left Los Angeles, in the fall of 1848; that he had frequent consultations with him respecting his rancho; that in various conversations Flugge spoke of a grant to Cambuston between his own rancho and Sutter's line; that in October, 1848, or the spring of 1849, Cambuston showed him (witness) a paper purporting to be a grant for the ranch in question; that he (witness) advised him to retain it carefully until a government should be organized; and that he subsequently filed it with Major Canby, by his (witness') advice.

Jacob A. Morenhout testifies that he first heard of the claim of Cambuston; in 1846, soon after his arrival in California; that when obtaining a description of the French residents from his predecessor in the office of consul of France, he was told by the latter that Cambuston had a claim for a large tract of land on the Sacramento river, but that it was then thought of no value; that in 1847, as he believes, or perhaps in the beginning of 1848, Cambuston deposited in the consulate a bundle of papers, among which was this title; and that he is positive he saw the title long before there was any doubt raised about it, and before the lands were of any value.

The evidence of this witness, which had been taken before the commissioners, was disregarded by the supreme court because of his interest in the suit. The testimony above cited is contained in a deposition taken since the cause was remanded. In that deposition he states in the most positive manner that he has sold out all his interest in the claim, and that he has now no interest whatever in the event of the suit. His character is wholly unimpeached, his testimony entirely uncontradicted. He came to California as consul of France, and he continues to hold the office of vice consul at Monterey to the present time. I know of no reason why his statements should not be received by the court with entire confidence. Captain H. W. Halleck testifies that he heard of this grant in the spring of 1847, and also heard that Cambuston was endeavoring to get Americans to go and settle upon it.

It must, I think, be taken as proved, that a grant of some kind was in existence shortly after the date of the grant produced in this case, and before the return of Pio Pico to California in the spring of 1848. All the witnesses agree that the grant heard of by them was for lands in Sacramento valley. Colonel Stevenson identifies the grant he heard of with that now exhibited by the designation of Flugge's rancho as one of its boundaries, and his conversation with Flugge respecting it; and Morenhout mentions that he was "attracted by the quantity, eleven leagues, but it was not worth anything."

The objection, therefore, of the supreme court, "that the grant was unknown to any person besides the grantee and another interested party, until filed among the archives in 1850," is conclusively answered.

There is also some evidence to show that in October, 1846, the land was occupied and cultivated. But the only testimony on this point is that of Victor Prudon; and the fact is not material, for the occupation testified to was after the conquest, and the existence of the grant shortly after its date is proved, as we have seen, by more reliable testimony.

With respect to the consideration for the grant, Governor Alvarado testifies that Cambuston rendered services as public printer to the government from 1841 to 1846; that he was not paid for those services; and that he (Alvarado) offered him land in payment,

which he did not then accept; but that he (witness) heard that one of his successors had granted land in compensation. With respect to this testimony it is to be observed: (1) That it is only hearsay. (2) That no mention is made in the grant of any such consideration. (3) That it appears from the documents produced from the archives, and which will hereafter be referred to, that on the eighth of August, 1844, Bocanegra, minister of relations of Mexico, transmitted a dispatch to the governor of California, in which he enclosed a communication from the French minister at Mexico, complaining that Henry Cambuston, a French citizen, had been driven from California, and that Cambuston protested his innocence, etc. The French minister, therefore, demands that he be permitted to return, etc.

The statement of Alvarado, that from 1841 to 1846 Cambuston was employed at Monterey as teacher and public printer, must consequently be untrue. It cannot be said, therefore, that the objection raised by the supreme court that this grant was a pure donation has been satisfactorily answered.

An objection, however, is taken to this claim, which was not urged heretofore, either in this or the supreme court. It is claimed that Cambuston was a citizen of France, and therefore incapable of taking a grant.

This objection is urged: (1) To show that, even if all the preliminary steps had been taken, and the grant in all other respects regularly made, the governor exceeded his powers. (2) That the fact that the grantee was a foreigner, and notoriously known to be such, would certainly have been made known to the governor had the usual informes with regard to the qualifications of the applicant, etc., been asked for and obtained, and that the fact that he was so known to be a foreigner, is a strong circumstance to show that the grant was executed without the usual informes having been asked for. (3) That the issuing of so large a grant to a foreigner at that time, and under the circumstances of its alleged execution, shows the want of that bona fides on the part of the governor in the exercise of his authority, which, as also the existence of his authority to make the grant, the supreme court has declared, "should in this and similar cases be inquired into, and scrutinized with great care."

The evidence which is relied on to prove that Cambuston was an unnaturalized foreigner, is the following:

(1) The deposition of Morenhout, taken by the claimant. This witness testifies that when he arrived here as French consul, he obtained from his predecessor a description of the French residents of the country, and was told that Cambuston had a grant, etc., and that subsequently Cambuston deposited his papers in the consulate.

This witness does not expressly state that Cambuston was a Frenchman, but it is clearly to be inferred from his account that he first obtained information about his affairs, as such, and the subsequent reception of the papers in the consulate, can hardly be accounted for on any other hypothesis.

(2) Colonel Stevenson, also a witness for the claimant, states that Cambuston spoke French and Spanish, but no English.

(3) It appears from the archives that, on the eighth of August, 1844, a dispatch was sent by Bocanegra, minister of relations of Mexico, to the governor of California, inclosing a communication from the French minister at Mexico, in which the latter complains that Henry Cambuston, a Frenchman, established in Monterey, had been driven from California; that Cambuston protested his innocence. The minister, therefore, remonstrates against such arbitrary conduct, and asks that he be permitted to return, etc. It also appears that, on the twenty-ninth of January, 1846, Manuel Castro, then prefect of Monterey, transmitted a communication to the secretary of the department, containing an account of a quarrel which had occurred between himself and Henry Cambuston, a teacher in the public school, and inclosing copies of communications relative thereto, between Louis Gasquet, acting French consul, and Jose Castro, commandant general, and also a copy of the proceedings had against Cambuston by Manuel Castro. In all these proceedings, Cambuston is spoken of, both by the French consul and General Castro, as a French citizen. It does not, however, appear, that the interference and protection of the French minister in 1844, or that of the French consul in 1846, were claimed by Cambuston.

As this objection was for the first time taken in the brief filed by the United States, the case was opened, that the United States might adduce the testimony above referred to from the archives, and that the claimant might show, if possible, either that he was not a foreigner, or had been naturalized. No proof on these last points has been submitted by him. In the briefs filed on the part of the claimant, it is not urged that as a matter of fact Cambuston is not a Frenchman. He resides in this country, and is not unfrequently in this city. He is known to a large number of people, as is shown by the witnesses whom he has himself produced. If he were not a Frenchman, Morenhout, Colonel Stevenson, and many others could readily have so stated. The absence, therefore, of any attempt to repel the presumptions arising from the proofs above cited, and even of any denial of their truth, justifies me in treating those proofs as establishing that Cambuston was a French citizen. Assuming, then, that he was a foreigner, and not naturalized, we proceed to inquire whether he could take lands by grant in colonization, and whether in attempting to grant lands to him, Governor Pico exceeded his authority.

By the law of 1824, foreigners were not

only permitted but invited to settle, as colonists, on the vacant lands of the Mexican republic.

But the circumstances connected with the settlement of Texas, or other considerations, induced the government, in 1836, to adopt a more jealous and exclusive policy.

By the constitutional laws of December 29th of that year, it is provided, "that foreigners cannot acquire real estate in the republic, unless they have been naturalized and married to a Mexican woman, and have otherwise complied with the laws relating to such acquisitions. The acquisitions of colonists will be subject to special laws of colonization."

Under this provision it might perhaps have been doubtful whether it was intended merely to prohibit the acquisition of lands by foreigners in the ordinary modes, leaving their rights to acquire lands as colonists to be governed by the then existing special laws, or whether it was intended to make the prohibition general, leaving their rights as colonists to be fixed by future special laws.

But we have abundant evidence of the construction given to this provision by the authorities of California. In 1843, Isaac J. Sparks, a native of the United States, but a naturalized Mexican, applied for a grant of land, and the usual informes were ordered. The alcalde of Santa Barbara reported that Sparks "was married in the United States, which is a good reason why he cannot marry with any one in this country." And Dominguez, the prefect, reported that "as the law in speaking of strangers, prohibits them from acquiring real estate in the republic unless naturalized therein, married with a Mexican, etc., your excellency will order in the matter what may be proper."

On these reports Micheltorena orders the proceedings to be suspended "until the arrival of the new constitution," viz., that of 1842, which will presently be noticed.

In December of the same year Sparks renewed his application, wherein Jimeno, the secretary, reported:

"The party interested has not acquired the land he petitions for, on account of his not being married to a Mexican, as required by the constitution of 1836, and although by a subsequent decree foreigners were allowed to acquire real estate in the republic, exceptions are made in the frontier departments, which have been subjected to regulations which have not yet been received. I believe it would be an act of justice to grant the land to the petitioner, as he is honorable and industrious, and a naturalized citizen."

The land was accordingly granted, but without the power to sell.

In the case of Sansevain, a French citizen, who applied for a grant, Jimeno reported as follows: "Don Pedro Sansevain is not naturalized, an indispensable requisite in order to acquire property in the territory, but he may be permitted to cut wood upon the land until he is naturalized and can receive the title he desires."

Sansevain was accordingly naturalized, and on the twenty-first of April, 1846, renewed his application as a Mexican, by naturalization, to Governor Pico, by whom the land was granted on the twenty-first of April, 1846, about one month before the date of the grant to Cambuston. In the decree of concession and the final title, the fact is carefully set forth that the grantee is a Mexican citizen by naturalization.

I am not aware of any case in which the espediente shows that this "indispensable requisite," as it is called by Jimeno, was dispensed with. It is surprising that the first and only instance of the kind should be that of Cambuston, who two years before had been driven from the country, and a few months before had been involved in a long and acrimonious dispute with the authorities, in which the representative of his nation felt himself called on to interfere.

The subsequent decree to which Micheltorena and Jimeno allude is undoubtedly that of March, 1842.

By this law, foreigners, not citizens, were authorized to acquire real property in the republic; but by article 9, it was enacted, that "those arrangements should not include the departments on the frontier and bordering on other nations, in regard to which special laws of colonization will be enacted, without the power to foreigners to ever acquire property in them without the express license of the supreme government." Rock. p. 612.

It is suggested that this was a restriction intended to be made in future laws of colonization, and not a limitation in the then existing laws.

But even if this be so, the latest existing law was that of 1836, which we have seen denied all right to foreigners to acquire lands, unless naturalized and married to a Mexican; and it is impossible to suppose that Santa Ana, when by his edict of 1842 he removed these disabilities as to the central departments, and declared that the frontier departments were not included in the new arrangements, but with respect to them special colonization laws should be enacted, under which foreigners should not acquire lands without the express license of the supreme government, intended that the ancient and liberal law of 1824 which offered lands to all foreigners, without the license of the supreme government, should remain unrepealed.

The fact that future special laws of colonization containing this restriction were promised, shows that he, like Micheltorena, Jimeno, and the other authorities of California, regarded the law of 1824 as modified or repealed, in this respect, by the law of 1836.

But even if, contrary to the construction given to it by Jimeno, we construe the law of 1836 as not repealing the colonization laws

of 1824, that repeal must, nevertheless, be deemed to have been effected by the twelfth article of the law of 1842.

That article provides that "foreigners cannot acquire royal or public lands, in all the departments of the republic, without contracting for them with the government, which possesses this right as representing the domain of the Mexican nation." Rockw. p. 613.

It must, therefore, be concluded, that at the time the grant to Cambuston purports to have been issued, he had, if an unnaturalized foreigner, no capacity to take lands without the express license of the supreme government.

It is urged, however, that the court is bound to presume that the governor did not exceed his authority; and, therefore, it must presume either that Cambuston was naturalized and that the governor was duly apprised of the fact by the preliminary proceedings, or else that the express license of the supreme government was obtained.

It is undoubtedly true, as a general principle, that the public acts of public officers purporting to be exercised in an official capacity and by public authority shall, in the absence of proof to the contrary, be presumed to have been done in the exercise of a legitimate, and not a usurped, authority. U. S. v. Arredondo, 6 Pet. [31 U. S.] 727.

The acts, therefore, of a public officer, to whom a public duty is assigned, within the sphere of that duty, are, prima facie, taken to be within his power. "He who would controvert a grant executed by the lawful authority, with all the solemnities required by the law, takes upon himself the burden of showing that the officer transcended the powers conferred upon him, or that the transaction is tainted with fraud." · U. S. v. Clarke, 8 Pet. [33 U. S.] 453.

These principles are declared by Mr. Chief Justice Marshall "to be too deeply founded in reason and law ever to be successfully assailed."

The justice of this remark is obvious. As by hypothesis the only evidence of the existence or non-existence of the power in the officer is the fact that he exercised it, the court is compelled to adopt one of two presumptions: either that he acted legally, or illegally. In the absence of all proof to the contrary, it could not rationally be presumed that he acted illegally. The other alternative must, therefore, be accepted.

But the force of this presumption must, from the nature of things, vary with the circumstances. Where the officer, as a governor or viceroy, appointed by the king, dependent on his favor and liable to be punished for disobedience; where the act in question is one of a series by which he repeatedly and notoriously assumed the power in question; where no assignable motive appears which could have induced him, in the particular case, to exercise a usurped authority, nor any circumstances either in his own situation

or that of the grantee, or in the mode of exercising his power,—which suggests doubt as to the bona fides of the transaction, the presumption we are considering may be regarded as almost conclusive.

But where, as in this case, the grant purports to have been made by a governor within a few weeks of the time when the government of the territory passed from his hands, and during the very heat and conflict of the struggle in which his power was overthrown, where the evidence that the formalities required by law were observed is imperfect and unsatisfactory, and rests wholly in parol, where it does not appear that any preliminary inquiries were made as to the point on which he is supposed to have exceeded his authority, and where the situation of the granting officer, and the mode in which he exercised his authority in other cases at or about the period when the grant purports to have been issued, suggest the suspicion of carelessness, if not recklessness, in the exercise of his powers,—under all these circumstances it must be admitted that the presumption we are considering loses much of its force, if it be not entirely repelled.

It is declared by the supreme court in this case, that this grant, purporting to have been made under the circumstances above referred to, and "all others similarly situated, should be scrutinized with great care, both as to the authority of the governor to make them and the bona fides of its exercise."

But how can such scrutiny be exercised if we apply to them a blind and technical presumption of legality, raised by the mere fact that the governor signed the grant, and treat that fact as satisfactory evidence of the governor's authority, unless the United States produce proofs to the contrary, in their own nature impossible to be furnished?

The United States have shown that the governors of the frontier departments had no power to grant lands to foreigners; certainly not without the express license of the supreme government, if we adopt the construction of the law of 1842, most favorable to the claimant.

They have also shown, I think satisfactorily, that the grantee was a Frenchman, and that within a few months of the date of the grant his rights as such were vigorously asserted by the representative of his nation; that he was by that officer and by the California authorities treated and recognized as such throughout a protracted proceeding; and, as this proceeding was taken for his benefit, it may be reasonably inferred to have been at his instance; and he should be regarded as having asserted his status as a French citizen, and as having demanded protection of the representative of his country as such.

No informes or preliminary inquiries were proven which show that it was ascertained by the governor that the grantee had been naturalized, nor is he, as was usual and almost invariable in similar cases, declared to

be such in the grant. If, then, this proof be not sufficient to overcome the presumption arising from the fact that the governor signed the grant, in what way can it be met?

The United States cannot prove the negative fact that the grantee was not naturalized. They may raise, as they have done, a strong presumption to that effect, by showing that he was of French birth, and that rights were claimed for him as a French citizen a few months previous to the grant. But as the forms of the proceeding to obtain naturalization were exceedingly simple, and they could be taken before any magistrate, it is impossible to prove that a particular person was not naturalized.

It seems to me clear, therefore, that in such a case the foreigner should prove the affirmative fact that he was naturalized—a fact peculiarly within his knowledge, and the means of proving which are easy. No such proof has been offered in this case.

The same observations apply to the other presumption in which the court is asked to indulge, viz.: That the grant was expressly authorized by the supreme government. The very state of facts for which the United States contend—viz., that no license was obtained—supposes affirmative proof that it was not given to be unattainable; for all that could be shown would be that no such license appears of record, in the archives or elsewhere, and such is the proof in this case.

Governor Pico, who was a witness for the claimant, makes no mention of any such license; and as it would have been the solitary instance of the kind which, so far as I am informed, ever occurred in the history of California, the fact could hardly have escaped his memory, nor would the claimant have omitted to establish it by the testimony of the governor.

Besides, it is impossible to suppose that so protracted and troublesome a proceeding as demanding and obtaining the license of the supreme government would have been resorted to, when the applicant could, without delay or difficulty, have been naturalized by an ordinary magistrate.

The idea, therefore, that such a license may have been obtained, appears to me rather an ingenious suggestion of counsel, than a legal presumption which the court should indulge.

But the case of U. S. v. Reading, 18 How. [59 U. S.] 9, is relied on as an authority decisive of this case. In that case the grant contained the usual recital "that the proper proceedings and investigations had been previously complied with according to the provisions of the laws," etc., in the form invariably adopted in all grants.

"Now this," say the supreme court, "is not merely the language of clerical formality, though it might be the same from usage in like cases, but it is a declaration of the governor's official and judicial conscience; that his power to make the grant has been used in a fit case," etc.

"We consider it conclusive of the fact of the petitioner's naturalization, precluding all other inquiries about it, in our consideration of this case, by the record."

With reference to that case, it is to be observed:

(1) That the grant to Major Reading states "that he is a Mexican by naturalization," which is not stated in the grant to Cambuston; and it further appeared, from the espediente, that the usual informes were obtained, and the petitioner reported by Jimeno to be a proper person for the governor's favor.

(2) So far as the principles laid down by the supreme court, in the extract above cited, can be supposed to apply to this case, they must be taken as overruled by its more recent decision in the case we are now considering.

"It is true," say the supreme court, "the document recites that a petition was presented, and that the customary investigation had been made in respect to the application. But this cannot be regarded as conclusive, or even satisfactory evidence of these facts when the question is raised, whether or not the alleged grant is made in conformity with the requirements of law—in other words, whether the preliminary conditions had been complied with, which enabled the governor in the particular case to make the grant." U. S. v. Cambuston, 20 How. [61 U. S.] 68.

The court then proceeds to distinguish between the Florida and Louisiana cases and those in California. In the first, the existence of the power to grant and the regularity of its exercise were presumed from the facts of the habitual granting of lands by certain officers, and the customary mode adopted in making them. In the California cases the power is expressly conferred and the manner of its exercise prescribed by law; and therefore no presumptions are admissible. But the court must look to the law for the power to make the grant, and the manner of its exercise.

If, then, the court refused to treat the recital that the customary investigation had been had, etc., as conclusive or even satisfactory evidence of the fact, but remanded the case that such proofs might be given, it is difficult to perceive how this court can treat the same recital as proving not only that the investigations were made, but that they resulted favorably to the petitioner, and that he was ascertained to have been naturalized, especially as he is not stated in the grant to have been a citizen, either by birth or naturalization.

In the Case of Reading, the informe of Jimeno, and the statement in the grant that he was a naturalized citizen, may well be regarded as a judicial ascertainment of the fact precluding all subsequent inquiries upon the subject.

But in this case no informes are produced. We have only the statement of Moreno that they existed in an espediente, which is lost,

and which no other witness ever saw. As to its contents we are wholly uninformed—and the grant does. not contain the result of the investigation, for contrary to the almost invariable practice, the political status of the grantee is not mentioned.

One other argument urged by the counsel for the claimant remains to be noticed. It is insisted that the "prohibition against foreigners holding lands is not restrictive upon the power of the governor to remove the disability, and a grant by him operates as an enfranchisement." In support of this proposition various cases are cited. 20 Johns. 706; 7 Johns. 290; 9 Johns. 362; 5 Cow. 397; 2 Wend. 133. But the distinction between those cases and the case at bar is obvious. In the decisions referred to, it is held that where the legislature directed a grant to issue to a particular person by name, or to a class of persons of which he was one, and a patent was executed to him in pursuance of the statute, it could not be objected that other and general laws disabled him from taking. The same sovereign authority which created the disability was competent to remove it, and the law authorizing the patent was held to operate as a repeal pro tanto of the previous general laws. In such cases the question is clearly one of intention, not of power. But the governor of California had no similar power. He was a subordinate agent, with powers conferred and limited by law. To say that he had authority to remove a disability created by law is to say that he was above and not subject to the law, and to affirm in effect that a violation of law by an officer of government operates as a repeal of it.

I have thus, in obedience to the injunction of the supreme court, inquired into and scrutinized this case with great care as to the authority of the governor to make the grant, and the bona fides of its exercise.

The result of that inquiry is, that the grantee was a foreigner, and does not appear to have been naturalized; nor is it shown that the express license of the supreme government was obtained. The governor, therefore, had no authority to make the grant.

The claim must be rejected.

NOTE. It will be observed that in the foregoing opinion the question is not presented by counsel, nor discussed by the court, whether a grant by the governor, unapproved by the departmental assembly, vested such a title in the grantee (assuming him to have been capable of taking) as the United States are bound to respect, notwithstanding that the land was not occupied or cultivated before the subversion of the Mexican authority. This point is supposed to have been determined by the supreme court in the case of Fremont v. U. S. [17 How. (58 U. S.) 542], the omission to take possession and fulfil the conditions during the short interval that elapsed between the date of the grant and the acquisition of the country by the United States being considered by the counsel for the United States entirely insufficient to give rise to the presumption of abandonment.

The following note was prepared for insertion in a volume of decisions of this court in land cases which it was proposed to publish. That project having been abandoned, it has been thought convenient to append it to the foregoing opinion. The Case of Cambuston was among the first decided by this court under the authority of Fremont v. U. S., and is believed to present a striking illustration of many of the observations in the annexed note.

The case of Fremont v. U. S., was among the earliest of the cases decided by the United States district court on appeal from the board of commissioners. It was the first in which the supreme court announced the principles by which this class of cases was to be decided. It has, therefore, remained the most important and the leading case on this branch of the law, and has exercised a controlling influence on all subsequent decisions of this court.

As the judgment of the district court was reversed by the supreme court, a fuller exposition of the grounds of that judgment than circumstances then permitted will, it is hoped, not be deemed disrespectful to the supreme court, nor, perhaps, prove uninteresting to the reader.

The authority of the governor of California to grant lands in colonization was derived from the law of 1824, and the regulations of 1828 made by the executive in virtue of the authority conferred by the law.

The first eight articles of those regulations are as follows:

"(1) The governors of the territories are authorized (in compliance with the law of the general congress of the eighteenth of August, 1824, and under the conditions hereafter specified), to grant vacant lands in their respective territories, to contractors (empresarios), families, or private persons, whether Mexicans or foreigners, who may ask for them for the purpose of cultivating or inhabiting them.

"(2) Every person soliciting lands, whether he be an empresario, head of a family, or private person, shall address to the governor of the respective territory, a petition setting forth his name, country, profession, the number, description, religion, and other circumstances of the families, or persons with whom he wishes to colonize, describing, as distinctly as possible, by means of a map, the land asked for.

"(3) The governor shall proceed immediately to obtain the necessary information whether the petition embraces the conditions required by the said law of the eighteenth of August, both as regards the land and the candidate, in order that the petitioner may at once be attended to, or if it be preferred, the respective municipal authority may be consulted, whether there be any objection to making the grant.

"(4) This being done, the governor will accede or not to said petition, in exact conformity to the laws on the subject, and especially the before-mentioned one of the eighteenth of August, 1824.

"(5) The grants made to families or private persons, shall not be held to be definitively valid without the previous consent of the territorial deputation, to which end the respective documents (espedientes) shall be forwarded to it.

"(6) When the governor shall not obtain the approbation of the territorial deputation, he shall report to the supreme government, forwarding the necessary documents for its decision.

"(7) The grants made to empresarios for them to colonize with many families, shall not be held to be definitively valid until the approval of the supreme government be obtained, to which the necessary documents must be forwarded, along with the report of the territorial deputation.

"(8) The definitive grant asked for being made, a document signed by the governor shall be given, to serve as a title to the party interested, wherein it must be stated that said grant is made in exact conformity with the provisions of the laws in virtue whereof possession shall be given."

Under the earlier governors, and especially un-

der Figueroa, who appears to have been among the most enlightened of them all, the practice observed in granting lands appears to have been in precise conformity with the requirements of the regulations.

The petition, accompanied by the diseno, was presented, and was referred by a marginal order to the municipal authorities, or other fit persons, for informes as to the qualifications of the petitioner, his means of occupying the land, etc.. and also as to the condition of the land, whether vacant or not, and as to its extent.

When the informes were received, the governor decided upon the application. "If he acceded to the petition," he did so by making a short decree, usually called the decree of concession, which was attached to the petition and informes, and constituted the espediente. The decree of concession usually directed that the espediente should be sent to the most excellent departmental assembly for their approval, but no title paper or documento· was as yet delivered to the party interested. It was not until after the assembly had approved the concession, and it had thus become "definitively valid," that the documento or title paper mentioned in the eighth article was delivered "to the party interested to serve as a title." This documento always expressed that it was in conformity with the provisions of the laws; and it contained various conditions, the breach of which subjected the land to "denouncement" by any one who might desire to obtain it for himself.

It would seem from the language of the eighth article that it was only when the concession had thus become definitive, and when the documento had been furnished to the party, that he had the right to apply to the "respective judge" to obtain a judicial measurement and delivery of possession of the land. In one instance, at least, which has fallen under my notice, it appeared that the judicial officer refused to give the possession on the ground that the concession had not been approved, and, on appeal to the governor, the local officer was sustained.

The loose and informal mode of conducting business, the small value of the lands, the infrequency of the meetings of the assembly, and other causes, soon led the governors to depart from the strict course of procedure with respect to concessions of land which Figueroa had observed; and the practice grew up of issuing the final documento, or title paper, immediately upon the making of the decree of concession. A clause was, however, inserted in the title, to the effect that the grant was subject to the approval of the most excellent departmental assembly. The grant was then, in advance of the approval, delivered to the party. and he usually proceeded at once to occupy the land.

It would seem, however, from the instance cited above, that when the point was formally presented to the governor, he did not feel at liberty to direct the judicial possession to be given by the "corresponding judge," until, by the approval of the assembly, the grant had assumed definitive validity

Of the grants so made by the various governors, many were subsequently approved by the assembly. This was done after a reference to a committee of that body, and upon a report by that committee. A resolution of approval was then passed, and a testimonio, or certified copy of the resolution of approval. was furnished to the party interested.

That the assembly did not consider their duties merely formal, is proved by the fact that, in some instances, the extent of the land granted was materially reduced, or rather the concession was approved only to a limited extent. In many cases, however, the espedientes seem never to have been transmitted to the assembly. and many of the ancient inhabitants of the country were found at the conquest in possession of and claiming to own lands by virtue of grants by the governor, unapproved by the departmental assembly.

There were also found in the possession of many persons, grants by the governor for extensive tracts which they had never occupied, nor, as in the case of the grant to Alvarado, perhaps even seen. As the Mexican rule approached the period of its final subversion. when war with the United States was on all sides recognized as impending, and after the rising of the American settlers in the country, known as the "Bear Flag War," had occurred, the governor (Pio Pico) appears to have distributed grants with a lavishness that would justify the suspicion that he hoped to secure to his countrymen, by the pen, the lands he foresaw they were about to be deprived of by the sword.

Under these circumstances, it became a point of vital importance to determine the effect and legal operation of the unapproved grants of the governors of California.

On this point two opposing views were suggested.

(1) It was held by some that the regulations merely provided that the concessions of the governor should not possess definitive validity until approved by the assembly or the supreme government, and that they did not provide that until such approval they should possess no validity whatever; that even when disapproved by the assembly the grant did not fail, but it was then the governor's duty to transmit the espediente to the supreme government for its approval, and the grant remained valid and effective, though not definitively so, until the supreme government had refused to approve it; that the concessions of the governor must, therefore, be deemed to have passed to the grantee a base or determinable fee, liable it is true to be divested by the refusal of both the assembly and the supreme government to approve, but remaining a vested and valid right of property until that contingency occurred. It was therefore contended, that the practice of issuing the grants immediately on making the decree of concession, and subject to the approval of the assembly, was more strictly in accordance with the law than that which obtained under Figueroa; and that the estates so granted, not having been divested by any refusal to approve on the part of the Mexican authorities. must be held valid and indefeasible by the American authorities.

It was also urged that, inasmuch as by the regulations it was the duty of the governor, not of the grantee, to transmit the espediente for approval to the assembly, any omission or neglect of duty in that respect ought not to work an injury to the grantee.

(2) On the other hand, it was maintained that the regulations, by a just and inevitable construction showed that, to make a valid or complete grant, the concurrence of either the assembly or the supreme government was necessary; that the practice under Figueroa was the only practice which could have been adopted in strict conformity with the law; and that grants issued in advance of and subject to the approval of the assembly, were essentially inchoate or imperfect titles; that the application, therefore, of the grantee for a confirmation, was in effect an application to the United States to complete and give definitive validity to a grant which, by Mexican law, was incomplete. and not "definitively valid," and which the United States were at liberty to refuse, unless the grantee could urge equitable considerations in his favor, such as would have bound the conscience of the former government if it had been asked to approve the concession; that these equities were to be found in the fact of the occupation and cultivation of the land, which would justify the grantee in asserting that he had rendered, and the former government received, the consideration upon which, by the policy of the colonization laws, the lands were granted. But where no such fact appeared, and where no settlement had been effected. and whether by the fault or the misfortune of the grantee was immaterial. the United States were at liberty to refuse to confirm and complete the title, defective and incomplete in itself, and

in aid of which the claimant could invoke no equities. The last view was that adopted by this court, for reasons, the fallacy of which I am obliged to confess myself to this day unable to perceive. It will be sufficient in this note rather to indicate than to develop or enlarge upon them.

(1) Whatever may be said of the validity which the unapproved grants of the governor may have possessed, it is evident, from the regulations, that the power to grant lands was intended to be vested in the governor concurrently with the assembly, or by and with the consent of that body; that the power of granting the public domain in the territories was not to be exercised at the absolute will of a governor appointed at Mexico, but was to be subject to the approval of the local legislative assembly, and in case of disagreement to the final decision of the supreme government.

To carry out this policy, the only strict and regular mode which could have been adopted was that pursued by Figueroa, whose practice was, as already stated, to decide himself in the first instance on the application, that is, to accede or not to the petition, then to transmit the espediente to the assembly, and to issue the documento or title paper when their approval had been obtained.

But if the governor had authority to grant an estate to an applicant, which could only be divested by the refusal of both the assembly and the supreme government to approve the grant, he could readily have defeated the whole policy of the law, for he had only to omit to send in the espediente for approval. The contingency on which the estate was to be divested could in such case never occur; for until the grant was submitted for their approbation they could have no opportunity to disapprove it.

But that the final title was not to issue until the concession had become definitive, that is, until it had been approved, is clear, from the very terms of the eighth article.

"The definitive grant asked for being made, a document signed by the governor shall be given to serve as a title to the party interested," etc.

It will be observed that this is the only document which, by the regulations, was at any time to be delivered to the party. Up to the time of its reception he might have remained in entire ignorance of the result of his application, and it was only by virtue of this document that judicial possession of the land could be given.

If, then, this document was his only title paper, and if, by law, it ought not to have been issued until the grant had, by approval, become definitive, it follows that no rights legally passed to him by virtue of any action of the governor previous to such approval; and that the delivery of the final documento, in advance of and subject to an approval, could not, in strictness, have vested any estate defeasible or other in the grantee.

It is, of course, not supposed that the action of the governor in acceding to the petition, or making his first decree of concession, was of no effect. It was the performance of a part, and a most important part, of the acts necessary to the execution of a grant of public lands. But it was not all that the law required. And until the concession had been approved it conferred no legal rights, any more than the nomination by the president of an officer to the senate confers, without confirmation by that body, a right to the office.

That it was the governor's duty to transmit the espediente to the assembly, and in case of their disapproval to the supreme government, is admitted.

But that fact serves more clearly to show that until such approval the proceeding remained exclusively in the hands and under the control of the government or granting power. That the applicant was not recognized as having yet acquired any rights, and might even, as before observed, have been ignorant of the action of the

government; for otherwise the duty of perfecting his title by the confirmation of the assembly would have been imposed upon the petitioner.

The fact, then, that a grant was not submitted to the assembly is not charged upon the applicant as a fault. It was his misfortune that the proceedings necessary to pass the title were not had. But the circumstance that the governor neglected his duty in this respect can have no effect to impart a validity to the governor's preliminary action, which it would not otherwise possess.

But as the practice of issuing the final title in the first instance had so long and so extensively prevailed in the country, as many ranchos had long been held and occupied under no other title, it seemed just to treat the reception of such a title as constituting an equity, which when followed and consolidated by an occupation and settlement, i. e., the rendering of the consideration contemplated by the colonization laws of Mexico, authorized the claimant to demand a confirmation by the United States.

But where the land had not been occupied, where the claim was founded solely on the fact that a title, unapproved by the assembly, had been delivered to the party, I was of opinion that he had no right to demand that this government should complete and make definitive that which the former government had left incomplete and inchoate.

The same conclusion was reached by another course of reasoning.

(2) It cannot be denied that the assembly and the supreme government possessed the right to avoid, by refusing to approve, the act of the governor in making the concession. This was a sovereign right and a proprietary right expressly reserved to them by the law, and by the terms of the document delivered to the party.

This right passed to the United States by the conquest, and could justly have been exercised in all cases where the Mexican authorities, had their government not been subverted, would have been at liberty to do so, i. e., where no equitable circumstances existed sufficient to bind the conscience of that government.

If, then, the Mexican government had found itself in the same condition as that in which the United States were placed; if lands which had been distributed by the league as almost without value had suddenly commanded enormously increased prices; if an immense immigration had set in of other Mexican citizens, who asked for and were willing to buy tracts of only one hundred and sixty acres instead of eleven square leagues; if the possession of such immense estates by single individuals had become contrary to the policy of her laws, the genius and habits of her citizens, and inconsistent with the rapid development of the resources of the country; if all these circumstances had existed, it may be declared with some confidence, that Mexico would have felt it to be not merely her right but her duty to exercise the power expressly reserved to her of avoiding the concessions of the governor, by refusing to approve them, in all cases where the grantee could allege no solid equities in his favor.

If, then, she had avowed her willingness to confirm and approve all such grants whenever on the faith of them the grantee had actually occupied and settled upon the land,—that is, whenever he could show that the government had received the consideration which the policy of the former laws had required,—it seemed to me that she would have done all that could have been claimed or expected from either her justice or her generosity.

The United States, succeeding to the rights and duties of Mexico, was at liberty to assume the same position, and had a right to demand, when called upon to recognize or confirm an unapproved grant, that the claimant should show occupation and cultivation of the land: not to avoid a forfeiture, as for breach of conditions subsequent in the grant, but as an indispensable

part of the equities on which he could rely for a confirmation.

It was for these reasons that I considered that in all cases evidence of the fulfilment of the conditions of occupation and cultivation was indispensable, and that as occupation and cultivation constituted an essential element of the equities on which alone the claimant could base his application, no excuses for its omission, or explanation of the obstacles which prevented it, could be received; for the inquiry was not whether by neglect he had forfeited a vested right, but whether by performing certain acts he had acquired one, or, in other words, whether any equitable circumstances existed which bound the conscience of this government to confirm and complete the title.

Under this view, the questions presented under the Mexican colonization laws bore a close analogy to those debated and decided in the Louisiana and Florida cases, in which it was held by the supreme court that the performance of the conditions constituted the chief ground of the claimant's equity. The decisions of that court in those cases I therefore considered as affording a guide and imposing a rule for the determination of land cases in California, and as the later decisions in the cases of U. S. v. Boisdore [11 How. (52 U. S.) 63], De Vilemont v. U. S. [13 How. (54 U. S.) 261], Glenn v. U. S. [Id. 250], etc., had rigorously required the exact fulfilment of the conditions, I feel obliged, reluctantly, to follow them: and in the Case of Cervantes [Case No. 14,768], to demand an occupation and settlement within the time limited in the grant—a decision apparently harsh and illiberal, but which, under the pressure of the later decisions of the supreme court, I thought myself compelled to make. But in the case of Fremont, I entertained no doubt. Alvarado, the original grantee, had not only never occupied, but, so far as appeared, had never even seen, the land for which he obtained a concession; and the obstacles which prevented a settlement existed at the time he applied for and procured the concession, and when he assumed the implied obligation to occupy and cultivate the land.

This land, unavailable and almost worthless under the Mexican government, had, chiefly in consequence of the American occupation, assumed an enormous value. It seemed to me, therefore, clear that the United States were in that case justified in refusing to recognize and perfect a claim in support of which the claimant could urge no other fact than the possession of a title-paper signed by the governor, but unapproved by the assembly or the supreme government.

But the supreme court overruled this decision. In its opinion, that tribunal seems to have adopted a view not precisely in accordance with either of those stated in this note.

It regarded the grant to Alvarado "as having given him a vested interest in the quantity of land therein specified;" but it proceeded to inquire "whether there was any breach of the conditions annexed to it, during the continuance of the Mexican authority, which forfeited his right and revested the title in the government." Fremont v. U. S., 17 How. [58 U. S.] 560.

To determine this point, the supreme court further proceeded to inquire, whether there had been such unreasonable delay or want of effort on the part of Alvarado to fulfil as would justify the presumption that he had abandoned his claim before the Mexican power ceased to exist. The court then considered the various obstacles which had prevented a settlement, and the efforts made to effect one: and finding no unreasonable delay or neglect on the part of the grantee, confirmed the claim.

The language of the supreme court is not explicit as to the important point whether it regarded the unapproved grant of the governor as vesting a legal estate, liable to be divested by breach of conditions subsequent, or as passing merely an equitable interest which the United States were bound to respect, unless forfeited by unreasonable neglect to fulfil the conditions.

On the true construction of the opinion of the supreme court, in this respect, much diversity of opinion has prevailed. If the grant to Alvarado had been approved by the assembly, and had thus become complete and definitive by the concurrence of all the granting powers necessary to its execution, the conditions would have remained conditions subsequent, the breach of which would not forfeit the estate, but would have merely rendered it liable to denouncement—a formal proceeding or mode of enforcing a forfeiture well known to the Mexican law. But if no such proceeding had been taken, and the fee remained in the grantee, undivested by any act of the Mexican authorities, it would seem that the courts of the United States could have no power to inquire into and declare forfeitures which had accrued under the former government.

But inasmuch as the supreme court did enter into the inquiry whether the grantee had forfeited his rights by delay or neglect, in its judgment, unreasonable, it may be inferred that the court must have regarded the estate or interest vested in the grantee as an equitable interest, liable to be divested by unreasonable delays or neglects, which might constitute an equitable forfeiture.

But whatever may have been the views of the supreme court on this question, the practical result of the decision was most important. For under it, every claim for which a title-paper signed by the governor was exhibited was to be confirmed, unless the United States could show that there had been such unreasonable delay or neglect to fulfil the conditions as would create the presumption of an abandonment.

The views previously taken by this court had been commended to it, not more by their supposed technical accuracy than by considerations of their policy and practical advantage.

In deciding upon the genuineness of any claim to land under Mexican grants, the most, if not the only, satisfactory evidence which can be offered, is that furnished by the archives and afforded by the notorious possession and claim of ownership under the former government.

But, under the decision of the supreme court, I found myself unable practically to apply this latter test; for it was always easy, in cases of fraudulent or antedated grants, to locate the land in districts where it could readily be shown that Indian hostilities presented an insuperable obstacle to a settlement, and by parol proof of this fact and of some efforts or attempts at a settlement by the pretended grantee, to make the case precisely analogous to that of Fremont.

But this was not the most important practical consequence of the decision. A greater part of the grants by Pio Pico, which have obtained the sobriquet of "eleventh-hour grants," were executed but a few months before the final subversion of the Mexican authority. The grantees, in many instances, had not seen the land, and had never taken any steps to effect its settlement. Unapproved by the assembly, issued with evident signs of haste if not carelessness, never occupied or cultivated, they seemed to possess less equities than almost any other. But these grants were precisely those with regard to which the court could not declare that they had been forfeited by abandonment.

The distracted condition of the country, and the impracticability of occupying the land, could always be alleged in excuse for the omission to do so. And independently of such excuses, it seemed impossible to presume an intention to abandon, from a neglect of a few months, when the customary period allowed for the purpose was one year.

The difficulty, therefore, of declaring the grant forfeited by abandonment increased in proportion to the shortness of the interval between its execution and the conquest of the country. And thus those grants, issued under the circumstances which have been mentioned, and which seemed more than all others destitute of real

equities, were the most secure from the operation of the principle announced in the Case of Fremont.

The book of Toma de Razon. for 1846, having been lost, and it being possible that the espediente in a particular case had met the same fate, the absence of archive testimony could not be regarded as conclusive evidence of the spuriousness of the title; and parol testimony, which it was not easy to contradict, however much it might be distrusted, was generally at hand to afford the requisite secondary proof of the contents of the lost espediente.

As proof of occupation could not be exacted, the court felt obliged to confirm these titles on proofs which amounted to little more than the verification of the signatures of the officers who executed them.

This result might, it is true, have been avoided by inquiring into the bona fides of the exercise of his authority by the governor. But an attempt to ascertain the motives of an officer, when performing an official act admitted to be legally within the limits of his authority, would in most cases prove abortive and unsatisfactory, and the conclusion reached would often be of too speculative and conjectural a character to form the basis of a judicial determination. For these reasons, it seemed to this court, when these cases were first brought before it, clear, that as a matter of law, as well as on the grounds of policy, and as a means of preventing frauds, evidence of occupation and cultivation should in all cases be exacted, where a claim was made under a grant by the governor, unapproved by the departmental assembly.